UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:11-CR-00034-TBR-01

UNITED STATES OF AMERICA                                                         Plaintiff

v.

DALLAS NORRIS                                                                        Defendant
(Defendant No. 1)

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant Dallas Norris's Motion to Submit Additional Evidence and Reconsider Motion to Suppress, (Docket No. 138), and Memorandum of Additional Evidence for Motion to Reconsider Defendant's Motion to Suppress, (Docket No. 186), in which Defendant requests this Court to reconsider its prior Order denying suppression, (Docket No. 39). The United States has responded. (Docket No. 189.) The Court has considered Defendant's Motion and Memorandum and the United States' response. This matter is now ripe for adjudication. For the reasons that follow, Defendant's Motion to Reconsider, (Docket No. 138), is DENIED

BACKGROUND

On March 7, 2012, the Court held a suppression hearing in Bowling Green, Kentucky, and the parties subsequently submitted briefing on the suppression issues. In the Court's April 11, 2012, Memorandum Order and Opinion, (Docket No. 39), the Court, having reviewed the briefings by the parties, the testimony at the suppression hearing, the exhibits that were introduced, and the information contained in Defendant's motions, addressed in substantial detail Defendant's complaints with the police's conduct. In relevant sum, the Court (1) found no evidence suggesting the police violated Defendant's

Fourth Amendment rights, (2) accepted the veracity of the officers' testimony and affidavit supporting the search warrant, and (3) found that the search warrant was supported by probable cause. (*See* Docket No. 39.) At that time, the Court also considered Defendant's motion to reopen the suppression hearing for testimony, (Docket No. 30), his motion to take judicial notice of certain weather conditions on November 12, 2011, (Docket No. 31), and his motion to admit exhibits he failed to offer into evidence at the hearing, (Docket No. 34). The Court ultimately granted his motions to submit additional evidence and considered that evidence in its Opinion, but denied his motions to reopen the suppression hearing and to suppress the evidence.

I. **Defendant's Arguments and Proffered New Evidence**

Defendant now moves the Court to reconsider its previous Order denying suppression in light of additional evidence submitted by the Defendant that was not presented previously to the Court. The following is a summary of Defendant's additional evidence:

- Kentucky State Police (KSP) received an anonymous tip that the "biggest marijuana grow in Kentucky" was at 13930 Tompkinsville Road, property which the caller said was run by a woman who was then out of town but would return the following day. (Docket No. 186, at 1.)

- The anonymous tipster later called back and identified himself as "Darrell," further stating that the woman who owned the property and operated the grow was Josephine Polan. (Docket No. 186, at 1.)

- KSP Troopers White and Hodges went to 13930 Tompkinsville Road to investigate. Defendant argues that despite testifying at the suppression hearing that they were unsure who owned the property and where on the property the owner resided, the information provided to them by the dispatcher identified

- Josephine Polan as the owner of the property and operator of the grow operation. (Docket No. 186, at 2.)

- Upon arriving at the property, the Troopers observed a "Private Property" sign. The property had two residences, each off a separate fork from the main driveway. The Troopers proceeded up the driveway and separated at the fork, with Trooper Hodges heading one way and Trooper White the other. Trooper Hodges encountered Shelli Goheen, who informed him that the property was owned by Defendant. Trooper White went to the other residence, Defendant's, but could not locate anyone. According to Defendant: "The officers had now been told that neither of the alleged owners of the property were present. They knew that the owner or resident of 13930 Tompkinsville Road was not there." (Docket No. 186, at 2.)

- The Troopers testified at the suppression hearing that they were going to the location to conduct a "knock and talk." However, Defendant argues, the KSP dispatcher had been told that Josephine Polan would not return until the following day, and Mrs. Goheen had advised the Troopers that Defendant was not presently there. Thus, Defendant argues, "It is impossible to conduct a 'knock and talk' with a person that you have been told is not there." (Docket No. 186, at 3.)

- Based on the information provided to the KSP dispatcher, the Troopers had information "that marijuana was being grown in the back of the building." Therefore, Defendant concludes, "Since the officers knew the owner(s) were not at the residence or on the property, they now needed probable cause to remain on the posted 'Private Property.'" (Docket No. 186, at 3.)

- The Troopers testified that they walked down the driveway because they saw a vehicle parked outside a large barn, which was farther down the drive past the residence, in order to ensure they were at the correct location and to knock on the door of the barn to see if anyone was present. This, according to Defendant,

- demonstrates that "[i]t was obvious that the officers were trying to find an excuse to get close to the big building in the back of the property, since the tip from the unknown caller stated that the 'biggest marijuana grow in Kentucky' was located in this building." (Docket No. 186, at 3-4.)

- As in his original motion to suppress, Defendant again essentially challenges the truthfulness of the Troopers' testimony that they smelled marijuana outside the barn. First, Defendant asserts that "[t]he troopers claimed to smell the marijuana from a location where the wind was blowing away from them (wind at their backs) . . . thus, pushing the smell, if any existed, away from them." Next, Defendant quotes a portion of one of the Trooper's testimony where the Trooper states that the first thing they observed inside the barn was the loud roar of the fans operating therein. "Yet," Defendant argues, "the Troopers could not hear any of this when they were outside. Ironically, the building was sound proof, but the smell was able to secrete out and move up wind, while remaining sealed to hold the sound in." Because "[i]t is impossible for a sound proof building to emit vaporized molecules [necessary for them to be smelled]," and because "[v]aporized molecules are heavier than sound waves," Defendant maintains it would have been impossible for the Troopers to smell anything coming from inside the barn. (Docket No. 186, at 4-5.)

- Defendant argues that "[t]here is no case law that allows a person other than the resident or owner to give valid consent to either remain on property or to search property." Thus, the Troopers violated Defendant's rights because after speaking to Mrs. Goheen and receiving no answer at Defendant's residence: "[T]he lawful ability to conduct a 'knock and talk' was over. The property was posted 'Private Property'. The troopers were now trespassing by remaining on the property for any purpose other that [sic] directly leaving the property." (Docket No. 186, at 5-6.)

- Because the Troopers should have at that point been in the process of exiting the property, and because it would have been impossible for them to smell anything emanating from the barn, the Troopers lacked probable cause. But for the protective sweep the Troopers conducted before one of them left to obtain a search warrant, they would never have been on the backside of the building in a position downwind and nearer to the barn's exhaust. (Docket No. 186, at 6.)

- Because this evidence "discredit[s]" the Troopers' testimony, rendering it "suspect," their affidavit in support of the search warrant "contains false or reckless statements" under *Franks v. Delaware*, 438 U.S. 154 (1978). Thus, the affidavit rests solely on the anonymous tip provided by "Darrell," for whom "previous reliability . . . is non existent [sic]." Therefore, Defendant argues, the Troopers lacked probable cause for the search. (Docket No. 186, at 7.)

## II. Factual Findings Relied Upon by the Court in Its Prior Opinion Denying Suppression

The following is a brief recap of the relevant facts the Court relied upon in its Order and Opinion denying Defendant's motion to suppress:

The property at 13930 Tompkinsville Road is very large and located in a rural setting. There is a gate at the entrance to the driveway marked with the numbers "13930" and "13920," as well as a "Private Property" sign. The gate is capable of closing, thereby blocking the driveway. The driveway runs more than a quarter-mile through open pasture before forking off, with one spur leading to a mobile home where Roger and Shelli Goheen resided and the other leading to a mobile home occupied by Defendant. Also along the latter spur are several outbuildings, including a large barn at its terminus. The barn is approximately 75 feet from Defendant's residence. There is no gate or other impediment that would prevent a visitor from proceeding past the residence and approaching the barn on foot. On one side of the barn is a gravel parking area, and on the

other is a metal awning extending out from the barn, under which vehicles, equipment, and supplies were stored. (Docket No. 39, at 2-3.)

On November 12, 2011, Troopers White and Hodges were on duty when KSP dispatch informed them that an call had been received from an anonymous tipster that marijuana was being grown indoors on the property and that residents there were stealing electricity. Upon arriving at the location, the Troopers entered the property in their respective vehicles via the driveway, which was not blocked or gated off. The Troopers separated at the fork because neither Trooper knew which building or buildings comprised 13930 Tompkinsville Road. Trooper White approached the Defendant's residence and knocked on the door, but received no response and returned to his vehicle. Meanwhile, Trooper Hodges spoke with Shelli Goheen in the mobile home along the other spur, who indicated to him that 13930 was the other residence and that its owner, Defendant, was not at home. (Docket No. 39, at 3-4.)

The Troopers then reconvened at White's location in front of Defendant's residence. From this location, the Troopers observed a Chevrolet pickup truck parked in the parking area next to the barn. The presence of the vehicle and the well-defined gravel driveway leading to the barn led the Troopers to believe the barn was occupied. The Troopers also wanted to retrieve the license plate number from the vehicle's tags to confirm that Defendant's residence was in fact 13930 Tompkinsville Road. With these objectives in mind, the Troopers approached the barn on foot. According to Trooper White, at about fifteen or twenty feet away from the barn, he detected the strong odor of marijuana. He called Trooper Hodges over to where he was standing, and Hodges confirmed that he also smelled live marijuana plants. Trooper White then knocked on the door to the barn but received no answer. (Docket No. 39, at 4-5.)

The Troopers decided at this point that there was probable cause to obtain a search warrant for the premises. They began a protective sweep of the perimeter of the barn for

safety purposes before one of them left the property and drove the thirteen miles into town to obtain a warrant. Trooper White walked around the backside of the barn where he saw two men in a clearing behind the building. White spoke to the two men, Roger Goheen and John Landrum, who informed him that Defendant was the owner of the property and was on his way back from Louisville, Kentucky. At White's request, Roger Goheen called Defendant on Defendant's cell phone, and White identified himself to Defendant and explained the Troopers' presence on the property. Trooper White testified that Defendant consented to the Troopers' request to stay on the property but expressly told them not to go in any buildings. Defendant, however, stated in his affidavit that he never gave consent for the Troopers to remain on the premises. (Docket No. 39, at 5.)

Trooper White then left to obtain a search warrant, which was executed later that day. The search revealed some 1,267 marijuana plants, as well as a sophisticated marijuana grow operation, which included fluorescent lights and twelve electric fans that were used for cultivation. Defendant returned to the property at some point during the search and was later arrested. (Docket No. 39, at 5-6.)

Testimony at the suppression hearing supported the United States' contention that the weather was relatively calm on November 12, 2011. Neither Trooper White nor Trooper Hodges remembered it being particularly windy from the time they arrived at the property until they first detected the odor of marijuana. Defendant submitted evidence that the average wind speed that day was between 10 and 15 miles per hour. Despite some contention regarding the intensity of the wind, all parties agreed that when the Troopers approached the barn, the wind would have been blowing at their backs, pushing any smells from the barn away from their approach. (Docket No. 39, at 6.)

## STANDARD

"District courts have inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment." *In re Saffady*, 524 F.3d 799, 803 (6th Cir. 2008). "A district court may modify, or even rescind, such interlocutory orders." *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991). However, because there is an interest in the finality of a decision, a court should grant motions for reconsideration sparingly, *Rottmund v. Cont'l Assurance Co.*, 813 F. Supp. 1104, 1107 (E.D. Pa. 1992), and "only if the prior decision appears clearly to be legally or factually erroneous," *Mobley v. Warden London Corr. Inst.*, 2010 WL 3586964, at *2 (S.D. Ohio Sept. 13, 2010); *accord Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) ("Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice.").

And while a court is permitted to reopen a suppression hearing, it should be "extremely reluctant" to do so. *See United States v. Carter*, 374 F.3d 399, 405 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1111 (2005); *accord United States v. Stennis*, 457 F. App'x 494, 502 (6th Cir. 2012); *United States v. White*, 455 F. App'x 647, 650-51 (6th Cir. 2012). The Sixth Circuit has outlined several factors that a court should consider in deciding whether to grant a motion to reconsider suppression: "First, the party seeking to reopen must provide a reasonable explanation for failing to present the evidence initially. Then the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced by reopening the hearing should be considered." *White*, 455 F. App'x at 650-51 (citations omitted) (citing *Carter*, 374 F.3d at 405; *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985)).

DISCUSSION

Defendant offers primarily two new items of evidence in support of his motion to reconsider: (1) the quasi-anonymous tip call to the KSP that set the investigation in motion, and (2) the presence of ozone generators and air filtration/circulation systems inside the barn. Defendant essentially offers this evidence to augment his prior argument that the affidavit supporting the search warrant contained false or reckless statements. Put plainly, Defendant maintains that this evidence shows the Troopers lied. (*See* Docket No. 186, at 7 ("The Defendant has established sufficient evidence that the troopers have been discredited and there [sic] testimony becomes suspect.").) However, after careful consideration, the Court is satisfied that this additional evidence does not alter its previous ruling, and suppression is not warranted here.

**I.    Timeliness**

The Court entered its previous Order denying Defendant's motion to suppress on April 11, 2012. (Docket No. 39.) Defendant filed his Motion to Submit Additional Evidence and Reconsider Motion To Suppress on September 14, 2012. (Docket No. 138.) In that motion, Defendant stated he was "in need of additional discovery not yet provided by the government," which he "believe[d] will strengthen his assertions that evidence should be suppressed," and was "hopeful that all of the sought after documentation may be submitted to this Court no later than September 28, 2012." (Docket No. 138.) Though not required by Fed. R. Crim. P. 16, the sought-after discovery was provided to Defendant on September 28, 2012. (*See* Docket Nos. 183; 189, at 3 n.1.) Before the Court ruled on his motion, Defendant proceeded to file his Memorandum of Additional Evidence on October 4, 2012. (Docket No. 186.)

The Court's Scheduling Order of August 10, 2012, ordered that "Any pretrial motions shall be filed by **September 14, 2012**." (Docket No. 134 (emphasis in original).) Though not styled as motion for an extension of time, the Court construes Defendant's

September 14 motion as an effort to comply with the Court's Scheduling Order, and thus does not find his October 4 memorandum necessarily untimely based on the September 14 deadline. However, Defendant's September 14 motion was filed more than six months after the Court denied suppression. As will be discussed further below, some of Defendant's new evidence would have been known to him at the time of the suppression hearing in March 2012. The discovery obtained from the United States clearly was not known to him as it had not yet been received; but, the United States was not obligated to provide this information at any time sooner. Thus, if anything, the timeliness factor tilts against reopening the suppression hearing and reconsidering the Court's prior decision.

## II. Reasonable Explanation for Failing to Present the Evidence Initially

As mentioned above, the Court recognizes that Defendant's new information in regard to the anonymous tip to the KSP was not available to him until recently and, therefore, well after the suppression hearing was held in March 2012. (*See* Docket No. 189, at 3 & n.1.) But the Court is not similarly satisfied in regard to Defendant's new information concerning the ozone generators and air filtration/circulation systems. As the United States points out, evidence of these devices and their pertinence to the issue of suppression would have been known to Norris before the March 2012 suppression hearing and at all times since. Yet Defendant did not present this information until some six months after the Court denied suppression. Defendant has offered no reasonable explanation for failing to present this evidence or why it did not exist at the time of the suppression hearing. Therefore, in the absence of a reasonable explanation why the evidence of the ozone generators and air systems was not presented until now, the Court finds that this factor weighs heavily against reopening the suppression hearing and reconsidering the Court's prior Order denying suppression.

### III. Prejudice to the United States

The United States argues it would be prejudiced by reopening the suppression hearing because it would be forced to defend its position against evidence that could have been presented at that prior hearing and would ultimately have no effect on the Court's decision denying suppression. (*See* Docket No. 189, at 5.) Insofar as the evidence relating to the air systems and ozone generators would have been known to Defendant at the time of the suppression hearing, the Court agrees that to now reopen the hearing would force the United States to redefend its position against evidence that could have been presented initially. Moreover, the Court is satisfied that Defendant's new evidence in regard to the anonymous tip, for the reasons discussed immediately below, would not alter the Court's previous conclusion to deny suppression.

### IV. Character of the New Evidence and Its Effect on Suppression

Ultimately, the character of Defendant's proffered new evidence warrants neither reopening the suppression hearing nor a different outcome regarding Defendant's motion to suppress. First, Defendant basically argues that the contemporaneous existence of the anonymous tip naming Josephine Polan as the owner/operator of the marijuana grow at 13930 Tompkinsville Road and stating that Polan would not be home until the following day, together with Shelli Goheen's statements that the property was owned by Defendant, who was also not at home, thus rendered the Troopers' presence trespassory and required them to immediately leave the property. But, as the Court reasoned in its Order denying suppression, "Norris has not provided, nor has the Court encountered, legal precedent stating that when the police are told by a neighbor a building i[s] occupied, the police must abandon any further attempt to make contact with its owner." (Docket No. 39, at 10.) As the Court noted then:

> "[W]here knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the persons being sought out

even where such steps require intrusion into the curtilage."
[*Hardesty v. Hamburg Twp.*, 461 F.3d 646, 654 (6th Cir. 2006).]
The police are often granted license to approach outbuildings and other areas of the property for the purpose of initiating contact with a resident. *See, e.g.*, *id.* (officers permitted to go to back door of residence and knock); *United States v. Taylor*, 458 F.3d 1201, 1205 (11th Cir. 2006) (police could move away from door toward man coming out of barn); *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) ("[L]aw enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence."); *United States v. Noriega*, No. 09-CR-00240, 2010 WL 348350, at *5 (S.D. Ala. Jan. 22, 2010) (officer permitted to leave front door, enter back yard and speak with residents).

(Docket No. 39, at 9.) From their vantage point near Defendant's front door, the Troopers observed a vehicle parked next to the barn. This was the only vehicle visible to the Troopers on the spur of the driveway leading to Defendant's residence, and the vehicle was located in what clearly appeared to be a parking lot next to the largest building on the property.

In its prior Order, the Court found that "[a]pproaching the structure along the open gravel driveway was the next logical and reasonable step to seek out and speak with the Property's owner." (Docket No. 39, at 9 (citing *Hardesty*, 461 F.3d at 654; *United States v. Diaz*, 2009 WL 3675006, at *1 (N.D. Fla. Oct. 30, 2009) (officers permitted to approach an unobstructed barn in search of resident where truck parked outside)).) Furthermore, the Troopers did not know what the property owner's vehicle looked like, nor did they have any certainty regarding the identity of the owner. The Troopers stated that aside from their purpose of knocking on the door to the barn in hopes of locating the property's owner, a secondary purpose for approaching the barn was to retrieve the vehicle's license plate number in order both to confirm they were at the correct address and to verify the owner's identity. Thus, even if the Troopers were aware that the anonymous tipster had identified Josephine Polan as the owner and stated Polan would

not return until the following day, this information does not render the Troopers' decision to approach the barn unlawful. Whether the Troopers had reason to suspect marijuana was being grown in the barn has no effect on the Court's findings as to the Troopers' reasonable efforts to locate a property owner.

Finally, even assuming it were not untimely, Defendant's new evidence as to the character of the air systems and ozone generators does not undermine the Court's conclusions regarding the veracity and credibility of the Troopers' testimony at the suppression hearing. Defendant's detailed description of this equipment does not substantiate his conclusory contentions that "the building was sound proof" or that it was somehow impermeable to smell such that the Troopers' testimony must necessarily be false. As the Court found previously:

> Each [trooper] testified that they were familiar with the scent of marijuana through their previous training and experience. Both said the smell was powerful near the Barn . . . . Neither recalls it being particularly windy in the driveway such that men could not detect the large marijuana grow operation from this close proximity. The Court accepts the veracity of the testimony offered by Hodges and White on this point.

(Docket No. 39, at 12.) The Court went on, noting:

> To the extent Norris challenges the accuracy of the warrant's affidavit as containing reckless or false statements under *Franks v. Delaware*, 438 U.S. 154 (1978), he has not met his burden. He did not make a preliminary showing that the statement about smelling marijuana from the driveway was false or reckless. *Id.* at 155-56.

(Docket No. 39, at 12 n.3.) The Court is not now persuaded that Defendant's proffered new evidence discredits the Troopers' testimony. The Court has accepted the veracity of the Troopers' testimony and sees no reason based on this new information to change its position now. There were over 1200 marijuana plants later discovered in the building. The Court again concludes that the testimony of the Troopers that they smelled marijuana

is credible, even considering the new information regarding the air systems and ozone generators.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion to Submit Additional Evidence and Reconsider Motion to Suppress, (Docket No. 138), is DENIED.


cc: Counsel
      AUSA